# GILMAN, CLINTON AND SPRINGFIELD RAILROAD CO.

*v*

## JOSEPH J. KELLY *et al.*

1. TRUSTEE—*railroad directors becoming members of company contracting to build road.* It is illegal for directors of a railway company to become members of a company with whom they have made a contract to build and equip the road, so as to share in the profits, and if they do, they will, in equity, be compelled to account for the profits realized.

2. SAME—*railroad directors are, for stockholders.* The directors of a railroad company are, in an important sense, regarded as trustees for the stockholders, and it is a breach of duty to transfer the trust, or to assume obligations inconsistent with that relation, or to place themselves in opposition to the interests of the stockholders, or in such a position as that their individual interests will prevent them from acting for the best interests of those they represent.

3. SAME—*contracts in conflict with the relation.* The rule which prohibits a trustee or agent, private or public, from assuming a position tending to produce a conflict between his individual interest and a faithful discharge of his fiduciary duties, is so strict that no question will be allowed to be raised as to the fairness of the transaction, and no actual injury to the *cestui que trust* need be shown.

4. SAME—*cestui que trust has an election to ratify or avoid contracts in which trustee has a private interest.* If a trustee, as a director of a railway company, makes a contract for the building and equipping of the road, and reserves a private interest, or subsequently becomes interested in its execution with a view to participate in the profits of the contract, the *cestuis que trust,* or stockholders, may, at their election, ratify the act, and insist upon the advantages of it, or disaffirm it *in toto.*

5. RAILROADS—*fraudulent issue of stock.* If the directors of a railway company gratuitously give away certificates of stock, being a major part thereof, to contractors building the road, for the purpose of giving them a controlling influence in the election of officers and the management of the road, a court of equity will declare the same void, especially where a part of the directors are interested in the contract with the contractors.

6. RATIFICATION—*will not estop when done in ignorance of the facts.* No ratification of the acts of an agent or trustee will estop the principal or *cestui que trust,* unless he has been made aware of all the material facts and circumstances of the transaction that would in any way influence his mind or affect the transaction.

Appeal from the Circuit Court of McLean county; the Hon. Thomas F. Tipton, Judge, presiding.

This bill was filed by Joseph J. Kelly, as a stockholder in the Gilman, Clinton and Springfield Railroad Company, on his own behalf and on behalf of other stockholders. Afterwards, certain townships which had made subscriptions to the capital stock of the company, became parties complainant. A brief history of the company is given, from which it appears it was organized under the act of the General Assembly of this State, passed in 1867, and as amended by the act of 1869. A large amount of local municipal subscriptions, amounting in the aggregate to about $600,000, had been procured by the efforts of the directors, from counties and townships along the line of the proposed road. Interest-bearing bonds were issued by the municipalities making the subscriptions, nominally in payment of such subscriptions to the capital stock of the company, but in fact to aid in the construction of the road, and without which it appears the road could not have been built. With these municipal bonds to aid the enterprise, the directors were able to effect a contract with what is called the "Morgan Improvement Company," under which the railroad was finally completed, and from which the company afterwards received aid in procuring the rolling stock and equipment.

The Morgan Improvement Company seems to have been a company organized in the interest of the Pennsylvania Central Railroad Company, and was controlled chiefly by persons concerned in the management of that company. Propositions had been made by the Gilman, Clinton and Springfield Railroad Company to the Pennsylvania Central Railroad Company, to furnish aid to construct its road. Those propositions afterwards became the basis of a contract with the Morgan Improvement Company, by which the latter company obligated itself to furnish the funds necessary to build the road, and to furnish the iron-rails with which to lay the track, on

the terms and under the limitations in the contract stated. The proposition submitted by the Gilman, Clinton and Springfield Railroad Company to the Pennsylvania Central Railroad Company, in substance was, if the latter company, or a construction company in its interest, would construct and equip its road, it would pay $6000 per mile in bonds of counties and townships along the line of the road, and issue coupon bonds in amount thereafter to be agreed upon, not exceeding $25,000 per mile, bearing interest at the rate of ten per cent per annum, and to be secured by a mortgage, as provided in the charter. It was also further proposed to lease the road, when completed, to the Pennsylvania Central Railroad Company for a period of ninety-nine years, at $1 per year, provided such lease could be made without prejudice to the rights of parties holding the company's bonds. The further proposition, made on a subsequent day, had reference to procuring the right of way along the line, and suitable depot grounds.

The contract further bound the Gilman, Clinton and Springfield Railroad Company to issue certificates of stock for the remainder of the capital stock not taken, being of the nominal value of $1,400,000, to be delivered to the Pennsylvania Central Railroad Company, to be held in escrow, and to be delivered to the Morgan Improvement Company, as provided by the resolution passed by the directors on the 7th of December, 1869, which was made a part of the contract. It was stipulated the contract was not to be binding on the Morgan Improvement Company if any change should be made in the board of directors or officers of the railroad company without its consent or approval. The Gilman, Clinton and Springfield Railroad Company was also to execute mortgage bonds for $2,000,000, bearing seven per cent interest, to be deposited with, and held in escrow by, the Pennsylvania Central Company, and to be delivered in accordance with the resolution of December 7, 1869, made part of the contract.

The contract bears date the 20th day of May, 1870, was ratified by the directors of the railroad company, at a meeting held on the 7th of June next following, was afterwards submitted to a meeting composed of the stockholders, and seems to have been approved by them.

In September, 1870, Mr. Melvin, a director of the Gilman, Clinton and Springfield Railroad Company, and president of the company, Mr Black, another director, and Mr. Williams, who afterwards was appointed a director by the Governor, all became members of the Morgan Improvement Company, each paying for a share of the value of $50,000. The fact the president of the company and other directors became stockholders in the Morgan Improvement Company, it is charged in the bill, invalidated the construction contract. It is the principal ground on which the right to relief is predicated. The misappropriation of the funds of the company is attributed to this principal fact, as having been done with a view to the personal aggrandizement of the directors who had become members of the Morgan Improvement Company, and a majority of the stock of the company had been issued to that company with a view to secure the perpetual control of the affairs of the railroad company. The other principal allegation of the bill is, the directors were about to lease the road to the Pennsylvania Company for a period of nine hundred and ninety-nine years, on condition the lessee would secure certain bonds, and pay a large indebtedness owing by the Gilman, Clinton and Springfield Railroad Company to the Morgan Improvement Company.

The bill asked for a decree establishing the fraudulent character of the construction contract; that the directors, who had received profits under the contract, or from work on the line of the road, might be ordered to pay the same to the railroad company; that the stock issued to the Morgan Improvement Company might be cancelled; that certain income bonds, about to be issued by the railroad company, be declared void, and that the lease prepared by the directors, and sub-

mitted to the Pennsylvania Company, be declared null and void, and that the latter company be enjoined from claiming any rights thereunder.

The court, in accordance with the prayer of the bill, appointed a receiver pending the litigation, and, on the final hearing, rendered a decree declaring the contract between the Gilman, Clinton and Springfield Railroad Company and the Morgan Improvement Company fraudulent in law, and hence void; and also declaring stock issued to the Morgan Improvement Company to be illegal, and that it be surrendered up to be cancelled; also, restraining the Gilman, Clinton and Springfield Railroad Company from leasing its road to the Pennsylvania Company without the written consent of each stockholder, and, among other things, by an interlocutory order, referred the cause to the master to take and state an account between the Morgan Improvement Company and the Gilman, Clinton and Springfield Railroad Company. No account has yet been taken, but from that part of the decree which settles definitely the rights of the parties, the railroad company and the Morgan Improvement Company have prosecuted this appeal.

Messrs. HARVEY & WOLCOTT, for the appellant.

Mr. L. WELDON, for the appellees.

Mr. CHIEF JUSTICE SCOTT delivered the opinion of the Court:

The directors of the railroad company had abandoned any intention they may have had, before this bill was filed, to lease the road to the Pennsylvania Company, without the consent of the stockholders, having been advised they had no such authority under the charter of the company. It was, therefore, unnecessary to enjoin the making of a lease of the railroad without the written consent of each stockholder, which the evidence shows the directors had no purpose to do. With the written consent of all the directors, it would have been as lawful before as after the decree to make the

lease.    The decree conferred no new powers on the directors, nor imposed any new restrictions not previously existing.

The contract, which it is sought to have declared void, had been performed, in all its essential features, long before this bill was filed.    The Morgan Improvement Company had furnished the necessary funds and the iron rails, under the contract, with which the railroad company had completed its line of road, and had equipped it with the usual rolling stock, of a superior quality.    The municipal bonds, of the value of $600,000, and the $2.000,000 bonds, secured by first mortgage, had been delivered, and had been sold, and the funds realized used in the construction of the road.    No doubt, these securities have long since passed into the hands of third parties, and can not be directly affected by this litigation.

The evidence in this record, so far from showing the directors, who were members of the Morgan Improvement Company, made any profit out of the transaction, shows a positive loss.    There are, however, some assets belonging to the Company, but whether anything will eventually be realized. is a matter of serious doubt.    On the theory, however, the contract with the Morgan Improvement Company was illegal, as being interdicted by a sound public policy, complainants are entitled to have an account taken of profits, if any were realized, against the participating directors.

It is apparent, the only issue of any moment, as the case now comes before us, is, whether complainants are entitled to have the stock issued to the Morgan Improvement Company declared illegal, and to have a decree that the same be surrendered up to be cancelled.    While the principles underlying the decision of this question are of the gravest importance, the subject matter of the present litigation can be of but little value to any one, for the reason the evidence is conclusive the stock has no considerable, if any real, value.

But the question for decision depends mainly upon the question, whether the construction contract between the railroad company and the Morgan Improvement Company is

fraudulent in law. It is conceded, upon the determination of this question all other questions are collateral and dependent.

The court did not, by its decree, find there was any fraud, in fact, in the making of the construction contract with the Morgan Improvement Company. Indeed, the evidence would not justify any such finding. The subject of any director taking stock in that company had not been suggested before the making of the contract. The first mention of it was made to Mr. Melvin, on the same day, but after the contract had been signed. Mr. Williams was not then a director. With one exception, the directors all thought the contract was the most favorable one that could be obtained. The stockholders' meeting, to which it was submitted, was well satisfied with it, and, by a unanimous vote, passed a resolution of thanks to the board of directors for having procured it. When the matter was first mentioned to complainant Kelly, he expressed the belief it was a favorable contract. There can be no doubt, the contract with the Morgan Improvement Company was entered into with the utmost good faith. No fraud, in fact, existed, nor was any contemplated by the directors of the railroad company.

The vital question is. whether it was lawful for any number of the directors of the railroad company to become members and stockholders in the Morgan Improvement Company, with whom they had a construction contract. Whether the contract was originally valid, is not now an important subject of inquiry; for if it was illegal for the directors to become members of the construction company, and participate in the profits, if any should be realized, that fact would establish a right in complainants to have an account taken, as clearly as though the contract, in the first instance, was unlawful. The same conclusion would inevitably follow, and the result, so far as the participating directors are concerned, would be the same.

We are inclined to adopt the latter view, viz: that no director could rightfully become a member of the improvement

company, with whom the railroad company had a contract to furnish the means with which to build the road, with a view to share in the profits, and that if any gains should be realized in the enterprise, they would belong to the railroad company, upon the equitable principle which forbids the trustee, or person acting in a fiduciary capacity, from speculating out of the subject of the trust. It was not alone to facilitate the enterprise in which they were engaged the directors became members of the construction company, although it does appear that fact gave increased confidence to the contractors doing the labor, that they would ultimately get their pay. The sole object of becoming members and stockholders in that company was to realize gains. The duties devolving on a director of the railroad company were in antagonism with his interest and relation to the improvement company. What might be to the advantage of one company might be detrimental to the best interests of the other. A reference to the terms of the contract will make this view apparent.

The railroad company had in charge the actual construction and superintendence of the building of the road. It was its duty, under the contract, to let all contracts for grading, bridging and laying the track, subject only to the approval of the improvement company. In any event, the latter company was to have an agreed sum for every mile of track. Its interests would be to get the work done as cheap as possible. On the other hand, it was the duty of the directors to secure the construction of a good road, at whatever the increased cost might be.

In this connection it may be noted, as showing the inconsistent relations assumed by the directors, that the contract obligated the railroad company to issue to the Morgan Improvement Company the balance of the untaken stock, which was, in fact, a majority of all the stock of the company. It is admitted the stock was assigned with the avowed purpose of giving to the improvement company the control of the affairs of the railroad company, that no changes should be

28—77TH ILL.

made of its officers, or new directors elected, without its consent and approval. The reason assigned for it is, the stock was of no real value, and the construction company could not be induced to take hold of the work unless it had a controlling interest in the stock. It was expressly provided. the contract was not to be binding upon the Morgan Improvement Company, if any change should be made in the board of directors or officers of the railroad company without its consent or approval.

The directors of a railroad company are, in an important sense, regarded as trustees for the stockholders, and it would be a breach of duty to transfer that trust; to assume obligations inconsistent with that relation; to place themselves in opposition to the interests of the stockholders, or in such position where their own individual interests would prevent them from acting for the best interests of those they represent. The rule is the same that applies to all persons acting in any fiduciary capacity that requires the utmost fidelity to the interests of the *cestui que trust.* The rule, in its general sense, embraces every relation in which there may, by any possibility, arise a conflict between the duty to the person with whom the trustee is dealing, or on whose account he is acting. and his own individual interest. "It acts," as is well expressed by Mr. Justice WAYNE, "not on the possibility that, in some cases, the sense of that duty may prevail over the motives of self-interest, but it provides against the probability, in many cases, and the danger, in all cases, that the dictates of self-interest will exercise a predominant influence, and supersede that of duty." *Michoud* v. *Gerod,* 4 How. 503.

It may be added, the rule stands on the obligation which a party owes to himself and his principal, that forbids him to assume a position which would ordinarily excite a conflict between his individual interest and a faithful discharge of his fiduciary duties. It operates to restrain all agents or trustees, public or private. The inquiry is not whether the contract the trustee has made is the best that could have been made for the

*cestui que trust,* or whether it is fraudulent in fact. So strictly is this principle adhered to, that no question is allowed to be raised as to fairness of the contract. The principle has a broader scope. The law has absolutely inhibited the agent or trustee from placing himself in a position where his own private interests would naturally tend to make him neglectful of his obligations to his principal, or where his position would afford him an opportunity to speculate in the trust property. Accordingly, it is not indispensable there should be actual injury before the act of the trustee will be declared void, as being interdicted by the policy of the law. The *cestui que trust* has his election, to ratify the act of the trustee, and insist upon all the advantage of it, or disaffirm it *in toto,* as shall be most to his interest. *The People* v. *The Township Board,* 11 Mich. 222; *F. and P. M. Ry. Co.* v. *Dewey,* 14 Mich. 477; *Aberdeen Ry. Co.* v. *Blackie,* 1 M'Queen R. 461; *E. and N. A. Ry. Co.* v. *Poor,* 59 ib. 277; *Hoffman Steam Coal Co.* v. *Cumberland Coal and Iron Co.* 16 Md. 456; *Cumberland Coal Co.* v. *Sherman,* 30 Barb. 553.

The principles stated are applicable to the case at bar. Originally, the contract with the Morgan Improvement Company may have been one the directors could, with propriety, make, but a director of a railroad company can not make a contract on behalf of the company in which he reserves a private interest, nor can he subsequently become interested in its execution with a view to participate in the profits of the contract. Either act will render the contract void. at the election of the *cestui que trust.*

It is not contested the president of the railroad company, and two of the directors, after the making of the contract with the Morgan Improvement Company, became stockholders in that company, with the expectation of personal gains. Their interest was acquired before the contract was performed, and. during all the time it was being performed, they still retained their position as directors of the railroad company. and continued to act in its behalf. This they could not rightfully

do.   It is no matter it may have been really to the advantage of the railroad company, and that no fraud, in fact, was intended.   It was a breach of duty they owed to the stockholders, for whom they were, in a most important sense, trustees, and any one interested would be entitled to have an account of the gains and profits taken, if any should be realized under it.

But the most objectionable feature of the contract is that provision before alluded to, which obligates the railroad company to transfer to the Morgan Improvement Company a majority of the stock, for the purpose of giving to the latter company the entire control of the affairs of the railroad company.   The certificates of stock seem to have been issued gratuitously, and to a private company, in which the president and two of the directors of the railroad company had a direct pecuniary interest.

A court of equity will not sanction such a contract.   It is a palpable misappropriation of trust property to private purposes.   It was said by this court, in *The People* v. *Logan Co.* 63 Ill. 374, if the railroad gratuitously gave away its stock, "or if it was given for the fraudulent purpose of depriving the stockholders of dividends, or of destroying the value of their shares, or to prevent them from exercising their legal power of control over the road, in the election of directors or otherwise, then equity would, no doubt, afford relief."   The cases are sufficiently analogous to make the principle of the latter case conclusive of the one at bar.

In this case, certificates of stock to the amount of $1,400,-000, being a majority of all the stock, have been issued without any real consideration, with the evident purpose to deprive the other stockholders of any influence in the election of directors, or in the management of the affairs of the company.   It is of no consequence the stock may have been, and still is, of no real value.   The principle is the same, and is not affected by any such consideration.   The untaken stock was trust property in the hands of the directors, which they .

had no authority to bestow gratuitously upon themselves or others, with a design to deprive *bona fide* stockholders of their just influence in the management of the affairs of the railroad company. Whatever may have been the motive, the disposition of the stock was such the directors could not rightfully make, and the court properly decreed it should be cancelled.

The ratification of the contract between the railroad company and the Morgan Improvement Company by the stockholders' meeting. insisted upon. constitutes no obstacle to the relief sought. Whatever was done at that meeting was not done with a full knowledge of all the facts. It was not then known the president and two of the directors would become members of the Morgan Improvement Company, with whom the contract had been concluded. Had this important fact been known, it might have changed the conclusion of the stockholders. No ratification will estop the principal, unless he has been made aware of all the material facts and circumstances of the transaction that would in any way influence his mind or affect the value of the contract. *Hoffman Steam Coal Co.* v. *Cumberland Coal and Iron Co. supra; Cockerell* v. *Cholmelly*, 1 Russ. & Mylne, 418.

Conceding the fact the stockholders consented to the original contract, there is no pretence they consented the president and any number of the directors might become interested in the contract, and participate in the profits. Suspicion would have been aroused at once, had this fact been made known. It is an important consideration, and is that which renders the contract invalid as against any stockholder whose interest may be affected.

There is nothing in the point, complainants have not asserted their rights in what is called "apt time." No unreasonable delay was suffered, nor have the rights of third parties intervened so as to prevent relief.

The decree of the circuit court will be affirmed.

*Decree affirmed.*